[Civ. No. 22718. Second Dist., Div. Two. Apr. 18, 1958.]

MINNIE CROSBY et al., Appellants, v. JOSE GUADA-LUPE MARTINEZ et al., Respondents.

Vaughn, Brandlin & Baggot for Appellants.

Dryden, Harrington, Horgan & Swartz and Vernon G. Foster for Respondents.

ASHBURN, J.—Plaintiffs in this personal injury action appeal from an adverse judgment which was entered pursuant to a jury's verdict. They rely upon errors of law which are claimed to have been highly prejudicial.

Plaintiffs, two Negro women, were injured in a collision of automobiles which occurred within the intersection of San

Pedro Street and Vernon Avenue, in the city of Los Angeles. Plaintiffs were traveling east on Vernon and defendants south on San Pedro; this was shortly before noon on May 25, 1955. Defendants' automobile ran head-on into the left rear fender of plaintiffs' car, a 1951 Mercury, and the point of impact was within the southwest quarter of the intersection. The crucial issue was who ran the red light.

Plaintiffs testified that they approached and entered the intersection at a moderate speed of 20 to 25 miles an hour, that the green signal light was with them when they entered. Neither one of them saw defendants' car until just before they were struck. Plaintiffs' witness Robert Lee Hall, who was sitting on the fire plug at the northwest corner of the intersection, testified that he saw defendants go south through a red light at a speed of 45 to 50 miles an hour and strike plaintiffs' vehicle at the left rear fender; that plaintiffs had entered on the green light. Albert K. Houston testified that his car was standing southbound at the northwest corner and he was waiting for the light to change to green so he could turn to the west; that defendants passed him while the red light was on and at a speed of about 45 miles per hour. Tommy Harper said he was standing on the southwest corner of the intersection intending to cross the street to the north; that he had stopped for the red light and was waiting for the green; he saw defendants Martinez enter the intersection against the red light, traveling about 35 to 40 miles an hour; the light changed to green for north and south traffic after defendants had run into plaintiffs' car; plaintiffs did not enter against the red light.

Defendant Jose Martinez and his present wife were riding together and he was driving. Both testified that they were traveling only 20 to 25 miles an hour, saw the red light when a block away, and that it changed to green when they were half a block north of it; that they continued into the intersection at the same speed and with the green light still in their favor. Also, that there was an eastbound vehicle on the streetcar track on Vernon whose driver was waiting for the signal to turn in his favor; that while it was standing there plaintiffs' car passed it on the right and came in front of defendant just like a flash when it was too late for him to avoid a collision.

No one but the defendants Martinez saw any eastbound car which was stopped or which was passed by plaintiffs. All of plaintiffs' witnesses who mentioned the subject swore that

plaintiff Crosby was driving the eastbound car, but the defendants Martinez had plaintiff Moulton doing the driving while wearing a red coat. Defendant Jose Martinez at the scene of the accident accused Mrs. Moulton of running the red light. There were circumstances which impaired somewhat the credibility of each of the parties plaintiff and defendant; also plaintiffs' witness Harper. But no one other than the two defendants undertook to say that plaintiffs did not enter the intersection with the green light.

In this setting certain hearsay evidence was received tending to corroborate defendants in this respect. Police Officer William E. Meyer, called as defendants' last witness, was asked on cross-examination if he had the name of Irving Harris as a witness and replied in the affirmative. Nothing more was asked about the subject on cross-examination. Upon redirect the officer was asked by defense counsel to give his conversation with defendant Jose Martinez at the scene of the accident. He related defendant's version of the collision and added: "He also stated that a witness——." Plaintiffs' attorney objected upon the ground of hearsay and was overruled. The officer then said that Martinez "stated that a witness, Mr. Harris, gave him his name, and he also stated that Mr. Harris had told him that he, Mr. Harris, had been stopped on Vernon, heading east, for the red light, and that the driver driving the 1951 Mercury had passed him while he was stopped for the red light and ran the red signal, and was hit by southbound traffic." This is the only corroboration the defendants have with respect to the claim that it was plaintiffs who ran the red light. The officer also said he later tried to contact Harris by telephone but did not succeed. Plaintiffs' counsel started to examine him on recross about the same matter and the following occurred: "Q. Now, with reference to this followup of Mr. Irving Harris, you say that you were unable to contact him later? A. He had left the scene, and I always make a telephone call. Q. Did you make the telephone interview? A. I did not make the telephone interview. MR. FOXX: I object as assuming a fact not in evidence, and is hearsay. THE COURT: Sustained. . . . MR. BRANDLIN: The plaintiff offers to prove that the police report shows that a telephone interview took place shortly after the accident with Mr. Harris, and Mr. Harris stated that he was headed in a northerly direction on San Pedro when the light was red for the San Pedro traffic, at which time the accident took place. . . . THE COURT: What do you have to

say to that? MR. FOXX: In the first place, this is a completely hearsay document. The officer testified he did not at any time talk with Mr. Harris. It is made by a third party. THE COURT: Definitely, unless it was made by him, he cannot relate to them—— MR. FOXX: The only reason I went into the officer's conversation with Mr. Martinez was after counsel—— THE COURT: He opened it up. MR. FOXX: I thought the entire conversation was hearsay. THE COURT: This man knows of his own knowledge whether he had a conversation by telephone with Mr. Harris. It is proper. But what someone else did, what is in that report, that is improper.'' Plaintiffs' counsel then sought to examine about the contents of the police report and was blocked by a hearsay objection. He then inquired if Officer V. W. Vogel was the follow-up man and the witness said he did not know. Defendants then rested their case.

Immediately following that statement the transcript seems to start in medias res as follows: ''THE COURT: You know what my instructions were last night. You were going to have him here. MR. BRANDLIN: I was under the impression last night—there was the possibility that Irving Harris would be called. THE COURT: You were told distinctly he would not be here. MR. FOXX: In any event, I would object to any testimony by Officer Vogel, to any conversation he had with Mr. Harris or anyone else outside the presence of the parties, on the ground that it is pure, unadulterated hearsay. THE COURT: It would be. If you make an objection, I will sustain it. MR. FOXX: I will so object now, to expedite this, if we can. . . . MR. BRANDLIN: Of course, when the question was asked originally by Mr. Foxx, what was said by Mr. Harris and Mr. Martinez, I then said that it was hearsay, and I objected to it on that ground. THE COURT: You opened this up as far as Martinez was concerned. MR. BRANDLIN: I asked him what Mr. Martinez said, of his own knowledge, not what somebody else told him. THE COURT: You never mentioned anything about his own knowledge. MR. BRANDLIN: The minute the officer got into what Martinez told Harris, I objected on the ground that it was hearsay. THE COURT: It is part of the conversation. MR. BRANDLIN: It is not an admission. THE COURT: We may as well get this thing straightened out. If you want to make your offer as to what Vogel is going to testify to, I can rule on that, and save him coming over here.'' That offer was made and objection thereto sustained. After further discussion the following colloquy took

place: "MR. BRANDLIN: If it please the Court, I should like to make one observation, and that is this: True, normally when you open a conversation, all the conversation is admissible, if it is admissible on all other grounds. This wasn't admissible because it was hearsay. THE COURT: Where did you get that rule of law? MR. BRANDLIN: I think that is a basic rule. THE COURT: I am sorry, I can't agree with you. MR. BRANDLIN: May I have time to bring in Mr. Harris? I will have him here this afternoon. THE COURT: I am going to finish this case. I told you fellows in chambers last night— you asked Mr. Foxx the direct question if he was going to have him here, and he said no. MR. BRANDLIN: That is correct; but I had no suspicion that the statement of Mr. Harris made to Martinez would be admitted in evidence and presented to the jury. THE COURT: If your request is in the nature of a motion for continuance, it will be denied, in the state of the record now. MR. BRANDLIN: We would request the continuance until 1:45. THE COURT: It is denied."

Plaintiffs' objection to Meyer's testimony as to what defendant said that Harris had told him should have been sustained; it was unadulterated hearsay (see *Buchanan* v. *Nye,* 128 Cal.App.2d 582, 584-585 [275 P.2d 767]), and was not admissible under section 1854, Code of Civil Procedure, as is now claimed. That section says: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood may also be given in evidence." It has never been construed to authorize the reception of other portions of a conversation which are not explanatory of that which the opponent has brought out and which are intrinsically inadmissible. Volume 18, California Jurisprudence 2d, section 128, page 572: "When a detached act, declaration, conversation, or writing is given in evidence, evidence which is necessary to make it understood may be introduced. This rule contemplates a declaration of such a nature that it cannot be understood without the introduction of the entire statement. . . ." Section 129, page 574: "Moreover, the rule of the statute is subject to the limitation or qualification that the supplementing or explanatory testimony be confined to

the same subject as the one it supplements or explains, and that the portion of the evidence not relevant to the matter in question may be excluded. So also, where the inadmissible matter in a document is inseparably interwoven with the admissible parts, the entire document may be excluded.

"The court may properly exclude portions of a conversation that are not relevant to the part introduced, and portions of a document not relevant to any issue in the case may also be rejected. Such supplementing or explanatory evidence must likewise be excluded where its connection to the other evidence is doubtful and its admission would be prejudicial. A court should be reluctant to admit evidence which in itself is incompetent merely because of a more or less remote or inferential connection with evidence that is properly admitted." The decided cases support the text just quoted. (See *Loftus* v. *Fischer*, 113 Cal. 286, 288 [45 P. 328] ; *People* v. *McCoy*, 25 Cal.2d 177, 187 [153 P.2d 315] ; *Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237, 250 [116 P. 513] ; *Bacon* v. *Grosse*, 165 Cal. 481, 490 [132 P. 1027] ; *John Breuner Co.* v. *King*, 9 Cal.App. 271, 274 [98 P. 1077] ; *People* v. *Williams*, 123 Cal.App.2d 226, 231 [266 P.2d 599] ; *Estate of Nunes*, 140 Cal.App.2d 744, 747 [296 P.2d 29].)

"In passing upon the admissibility of such evidence, where the connection is doubtful, it is a safe rule to exclude evidence otherwise incompetent, where its admission would be prejudicial if erroneous. A court should be reluctant to admit evidence which in itself is incompetent, because of a more or less remote or inferential connection with evidence that is properly admitted. The purpose of a trial is to do justice between the parties, and even though such evidence, by reason of some slender thread of connection, is technically admissible under the above rule, it is not prejudicial error to reject it, unless its rejection results in a 'miscarriage of justice.' (Const., art. VI, § 4½.) ▮ Where a party seeks to introduce incompetent evidence, relevant, if at all, only because connected with other evidence already in the case, and admissible solely because of such connection, and where, if erroneously admitted, it would be prejudicial to one of the parties, and would have little, if any, proper weight with the jury, the trial court, if in doubt as to the sufficiency of the connection shown, should resolve the doubt in favor of the exclusion of the evidence, for the error in its exclusion, if any, would not be prejudicial to either party, while the error in its reception, if any, would be prejudicial to the party against

whom it is offered." (*Avery* v. *Wiltsee,* 177 Cal. 484, 486 [171 P. 95].)

The matter to which plaintiffs' attorney objected was not related to the testimony which he had brought out on cross-examination; it was objectionable hearsay and the ruling admitting it in evidence was patently erroneous. Coming from the mouth of this officer of the law the alleged statement of Harris took on a verisimilitude which it might not otherwise carry. It was obviously introduced for the purpose of corroborating defendants' own testimony and is the only evidence in the record which actually or apparently has that quality.

The subsequent efforts of plaintiffs' counsel to offset it by showing what the police report said or what Officer Vogel would say were properly frustrated by objections sustained. "The so-called 'open the gates' argument is a popular fallacy." (*Laursen* v. *Tidewater Assoc. Oil Co.,* 123 Cal.App.2d 813, 816 [268 P.2d 104].)

But his proposal to produce Harris as a witness bears a different complexion. This occurred upon the last morning of a trial which appears to have proceeded with reasonable expedition. Plaintiffs' counsel, as he pointed out, had no reason to anticipate and prepare to counteract egregious error in the court's rulings. Apparently he had no reason to foresee that he would need the presence of Harris. He well may have considered that a clear preponderance of the evidence was with him and that he would not need Harris as a witness. He was doubtless surprised at the admission of this hearsay statement attributed to Harris, and for the first time cognizant of the necessity of producing him. In the circumstances plaintiffs were entitled to the short continuance that their counsel requested. The fact that the court may have been under pressure to attend to other matters could not justify a refusal of a short continuance to which plaintiffs were entitled. "A litigant is entitled to a fair share of the court's time, and may not be deprived of an opportunity to present his case fully and fairly because someone else is being inconvenienced by having to wait his turn. No lawyer can foresee or predict all the vicissitudes that will occur in the course of a contested trial, which often consist of unpredictable rulings of the court. . . . The court stated no sound reason for denying the continuance and we can discover none. Had we been in the position of the trial judge we would have considered denial of the requested continuance to be an abuse of discretion. As a reviewing court, our views are not dif-

542

ferent, and we cannot put them aside merely because the trial judge believed it would be an abuse of his discretion to grant the continuance. We must be guided by the dictates of our own judgment and experience, and we hold that plaintiff's case was prejudiced for no good reason by denial of her request of a short continuance." (*Hays* v. *Viscome*, 122 Cal. App.2d 135, 140, 141 [264 P.2d 173].)

We deem it reasonably probable that a result more favorable to appellants would have been reached in the absence of the errors just discussed; this means a miscarriage of justice (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243]) and a reversal.

 Because of the necessity of a new trial, another alleged error must be considered (Code Civ. Proc., § 53). Over objection plaintiff Crosby was cross-examined with respect to her failure to possess a driver's license. First she was asked if she had ever taken the necessary tests in California. Having answered in the affirmative she was then required to disclose the fact that she never obtained a California license. Next it was developed that she had secured a Michigan license under a fictitious name. Near the close of the case plaintiff was recalled under section 2055, Code of Civil Procedure, and again interrogated on the subject with the obvious purpose of prejudicing her before the jury upon an extraneous pseudo issue; in immediate conjunction with this it was shown that she had been convicted of a felony, the nature of which is not disclosed by the record. An attempt was made to show that the conviction was under a fictitious name, another matter that was foreign to this case. There was no issue raised by the pleadings which would make the absence of a driver's license material or competent evidence. Absence of one is not evidence of negligence. If plaintiff was negligent, that had no proximate relationship to her possession or nonpossession of a license. If she was not negligent in fact, her failure to obtain a driver's license would not convert careful conduct into tortious absence of care. The applicable rule is succinctly stated in *Strandt* v. *Cannon*, 29 Cal.App.2d 509, 518 [85 P.2d 160] : "The weight of authority, as we see it, is that the operator's negligence is to be determined by the facts existing at the time of the accident, and whether the operator had a license to operate an automobile under the laws of this state is immaterial unless there is some causal relationship between the injuries and the failure to have a license or the violation of the statute in failing to have one." This language was quoted with apparent approval in

*Armenta* v. *Churchill,* 42 Cal.2d 448, 458 [267 P.2d 303]. To the same effect are, *Page* v. *Mayors,* 191 Cal. 263, 264 [216 P. 31] ; *Wysock* v. *Borchers Bros.,* 104 Cal.App.2d 571, 582-586 [232 P.2d 531, 29 A.L.R.2d 948] ; *Corsetto* v. *Pacific Electric Ry.,* 136 Cal.App.2d 631, 635 [289 P.2d 116] ; *People* v. *J. P. Loubet Co.,* 147 Cal.App.2d 566, 570 [305 P.2d 651] ; 7 Cal.Jur.2d § 393, p. 305.

█ Objection was made to the initial inquiry concerning this subject and was overruled. Later a motion was made to strike all evidence relating to possession or the lack of a driver's license, with the request that the jury be instructed that that evidence was immaterial. The Wysock case, *supra,* was cited to the court but the motion was denied. Both rulings were erroneous.

The judgment is reversed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied May 13, 1958, and respondents' petition for a hearing by the Supreme Court was denied June 17, 1958.